USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————X

GEIGTECH EAST BAY LLC,

     Plaintiff,

   -against-

LUTRON ELECTRONICS CO., INC.,

     Defendant.
———————————————————————X

18 Civ. 05290 (CM)
19 Civ. 04693 (CM)
20 Civ. 10195 (CM)

## DECISION AND ORDER

McMahon, J.:

This opinion addresses the two remaining post-trial motions that are pending in this case: (i) Lutron's Motion for Judgment as a Matter of Law on damages and (ii) GeigTech's Motion for Enhanced Damages, Interests, and Costs. Dkt. Nos. 590; 587. After two trials and many opinions over the past seven years, the Court assumed familiarity with the facts and major players involved in this case.

### I.    Lutron's Motion for Judgment as a Matter of Law

At the close of GeigTech's case in chief, Lutron moved for, and renewed at the close of all evidence, judgment as a matter of law under Fed. R. Civ. P. 50(a). In its motion, Lutron argued that GeigTech had not met its burden to support a jury verdict that calculated damages via the entire market value rule ("EMVR"). *See* Tr. 289; 466. I reserved judgment on the motion, leaving the issue open until the jury had the opportunity to determine what a reasonable royalty in this case would be. Tr. 466. Lutron now seeks the same relief under Fed. R. Civ. P. 50(a) and 50(b). *See* Dkt. No. 590.

During closing statements, the two parties reiterated their opposing positions on what a reasonable royalty should be:  Lutron asked the jury to award $398,706 and GeigTech asked the jury to award $4,054,302. Tr. 504; 522. After deliberations, the jury followed neither recommendation and returned a verdict awarding GeigTech $2,672,000. Tr. 551. What I said at the time remains as true now as it was then:  "One might say they think you're all unreasonable, and who am I to quarrel with that." Tr. 553.

### a.  Legal Standard

Judgment as a matter of law may be entered against a party only if "a reasonable jury would not have a legally sufficient basis to find for [a] party on that issue." Fed. R. Civ. P. 50(a). A Rule 50 motion may only be granted "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (alterations in original)). "In assessing the sufficiency of evidence to support a jury verdict, [the Court] must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004).

The two categories of compensation for patent infringement are a patentee's lost profits and the "reasonable royalty he would have received through arms-length bargaining." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The only measure of damages sought in this case was a reasonable royalty, which "seeks to compensate the patentee . . . for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if

it had been barred from infringing." *AstraZeneca A13 v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) (citing *Lucent Techs.*, 580 F.3d at 1325). GeigTech did not seek lost profits damages. It argued to the jury that the only measure of its damages was a reasonable royalty. And the Court instructed the jury accordingly:

> [A] reasonable royalty is not measured by the profits that GeigTech may have lost as a result of Lutron's infringement. It's not measured by the expenses that GeigTech incurred as a result of the infringement. And a reasonable royalty is never punitive; it's not intended to punish Lutron for infringing the patent. A reasonable royalty reflects a business deal that would have been agreed upon by rational businesspeople. It represents the amount that a purchaser of a license who wanted to use a patented technology and to make a profit would have been willing to pay to the owner of the patented technology who wanted to license the patent to some third party.

Tr. 538-39.

As an exception to the general rule that royalties are awarded based on the smallest salable patent-practicing unit, a patentee may also seek to recover under the "entire market value" theory of damages. Under this theory, a patentee may base its royalties on the entire value of the patented article "where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). The Federal Circuit has sustained recovery under this theory when "the invention inextricably worked with outer components of [the product] as a single functioning unit . . . improved the performance . . contributed substantially to the increased demand . . . [and] was integral to the overall performance" of the product. *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001). The Federal Circuit reiterated that conclusion where "[t]he evidence at trial portrayed general industry demand for" a certain type of product (e.g., aesthetically pleasing exposed shade brackets) and "the patented technology furthers these goals." *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1375 (Fed. Cir. 2010).

**b. GeigTech Presented Sufficient Evidence from Which a Jury Could Calculate a Reasonable Royalty of $2,672,000.**

At trial, both sides offered proposed damages calculations. GeigTech's expert, Mr. Jeffrey Baliban, testified that he calculated a reasonable royalty to be $4,052,302, while Lutron's expert, Dr. Christine Meyer, testified that she calculated a reasonably royalty to be around $400,000. Tr. 276-77; 428. The jury returned a verdict of $2,672,000.

Lutron's argument on its 50(a) motion proceeds as follows: (i) "the Court instructed that it was GeigTech's burden to prove that the '717 Patent was the sole driving factor for customers' demand for the Palladiom Wired Shading System;" (Dkt. No. 591, at 8); (ii) "'working the math backwards' suggests that the jury, in spite of not indicating so on the verdict form, improperly applied EMVR;" *id.* at 9; and (iii) GeigTech failed to provide sufficient evidence to justify the application of the EMVR; *id.* at 8. Therefore, Lutron argues, I should overturn the jury's verdict.

My charge was not so limited as Lutron implies. I explained to the jury that "GeigTech can only recover using the entire market value of Lutron's shading system if GeigTech proves that its patented technology — that is, the bracket that hides the wires — is the sole driving factor for customers' demand for Lutron's accused products." Tr. 540. This portion of my charge was directly accompanied by my instruction that, "Otherwise, you must apportion, so that the royalty only covers the value of the patented bracket and does not compensate GeigTech for any other features of the shading system." Tr. 540. I never cabined GeigTech's ability to recover to the entire market value rule alone. The jury always had the option to either apply the entire market value rule or to apportion.

### i.    Entire Market Value Rule

This is my second time addressing the reasonableness of a jury's using the EMVR to calculate GeigTech's damages. *See GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2024 WL 3595413,

at *20 (S.D.N.Y. July 30, 2024). I reiterate here what I emphasized in my prior opinion: Lutron's challenge to Mr. Baliban's testimony on the EMVR will be disregarded to the extent that Lutron is attempting to relitigate a *Daubert* motion attacking Mr. Baliban's methodology. *Id*. I write further, however, to address Lutron's additional argument – raised during trial and again in post-trial briefing – that the Federal Circuit's recent decision, *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948 (Fed. Cir. 2024), forecloses the application of the EMVR in this case. *See* Tr. 466; Dkt. No. 591 at 11. In *Provisur*, the Federal Circuit held that it was an abuse of discretion for the District Court to allow its plaintiff to seek damages under the EMVR where the plaintiff "failed to proffer sufficient evidence that other [product] features . . . do not cause customers to purchase the accused products." *Id*. at 958. Although the Court acknowledged that, "No one type of evidence is needed to show the patented features drove customer demand," it concluded that in that case, "There is simply *no evidence at all* that the patented features drove customer demand or substantially created the value of the [product]." *Id*. (emphasis added). Specifically, the Court refused to consider what it deemed "conclusory" testimony by the plaintiff's damages expert that "the patented features drive the demand or substantially create the value of Weber's accused products." *Id*. at 957.

The evidence that Mr. Geiger's patented wire-hiding innovation drove demand for Lutron's Palladiom shading system is more than conclusory in this case. Beginning with Mr. Geiger's own testimony, the jury heard evidence that, in his experience, shading features other than the visual appeal of the shade bracket were "secondary" considerations in selling an exposed shade like GeigTech's signature shade or Lutron's Palladiom system. Tr. 60. Specifically, Mr. Geiger explained that when GeigTech's product went head-to-head with Lutron's Palladiom shade – which he admitted excelled in such "secondary" features as quiet motors – as long as customers

preferred the look of GeigTech's brackets, they would choose his product over Lutron's. Tr. 60-61. Mr. Geiger concluded that it was specifically the look of GeigTech's brackets that was the real driver of customer demand for an exposed shading system. Tr. 61. John Nix, the former CEO of J. Geiger, also emphasized that hiding the wire drove customer demand, and that prior to Mr. Geiger's invention, existing brackets did not do a good job of hiding the wire. Tr. 90-92. In addition to testimony from its own witnesses, GeigTech elicited testimony on cross examination from Margaret Block, Lutron's Business Development Manager for Luxury Residential Shades, acknowledging that Lutron was losing sales to customers who valued the look of competing shading systems over, for instance, the quality of the shades' motors, their sound performance, the ability to control the shades, and precision alignment across multiple shades – factors similar to what Mr. Geiger called exposed shading systems' "secondary" features. Tr. 331-33. Finally, the fact that Mr. Baliban testified on cross examination that customers might consider some of these "secondary" features to be "important in their purchasing decisions," Tr. 281-82, does not amount to an admission under *Provisur* that these non-bracket features "cause customers to purchase the product." *Provisur*, 119 F.4th at 958. The relevance of Mr. Nix's cross examination statements that customers might value shade compatibility, the Lutron brand name, the quality of the motor, and other so-called "secondary" factors in their purchasing decisions is undermined by Mr. Nix's cabining that discussion to instances where customers were choosing between two shading systems where "the brackets look the same." Tr. 108-10. That is not the same as admitting that those secondary features "cause customers to purchase the product" over the primary consideration – here the bracket's look.

Although I have already established that the jury had sufficient evidence to deliver a verdict based on the EMVR, I also disagree with Lutron's assumption that it can shine a light into the

black box of jury deliberations by "working the math backwards" on the verdict to determine that our jury definitively *did* use the EMVR, despite straying so significantly from Mr. Baliban's proposed reasonable royalty. Lutron argues that the jury's decision to award $2,672,000 "strongly suggests" that the jury still used the EMVR because $2,672,000 is "almost exactly 1/3 of Lutron's total profits from sales of the Palladiom Wired Shading System" – as opposed to the "50-50" profit split that Mr. Baliban proposed. Dkt. No. 591, at 9. If a 50-50 profit split delivers Mr. Baliban's $4,052,302 figure, then a 1/3-2/3 split of those same profits would deliver a value of $2,701,534.67, which is *not* the number the jury selected as its damages verdict. Lutron's argument that the two numbers – roughly $30,000 apart – are "almost exactly" the same does not hold up. Lutron cites in support of its "close enough" calculation the Federal Circuit case *Lucent*, 580 F.3d at 1336. In *Lucent*, the Court held that substantial evidence did not support the jury's verdict and separately added that "Further, to the extent the jury relied on an entire market value calculation to arrive at the lump-sum damages amount, that award is not supported by substantial evidence and is against the clear weight of the evidence." *Id*. at 1324. On the second point, the Court in *Lucent* stated that "working the math backwards strongly suggests that the jury must have used some calculation of a rate applied to the entire market value of the software," and therefore reasoned that, "Assuming that the jury did apply the entire market value rule, such application would amount to legal error." *Id*. at 1336.

Specifically, in *Lucent*, the Court reasoned that it was likely that the jury used the EMVR because (i) the jury's verdict was $357,693,056.18; (ii) "it is difficult to understand how the jury could have chosen its lump-sum figure *down to the penny* unless it used a running royalty calculation;" and (iii) the Defendant's proposed recreation of the jury's calculation delivers a value of $358,835,648 – which is just 0.3194% off from the verdict that the jury in that case reached. *Id*.

(emphasis added). In our case, the jury's $2,672,000 verdict was not "down to the penny" like the verdict in *Lucent*, and Lutron's supposed recreation of our jury's math results in an estimate that is 1.1053% off from our jury's verdict – over three times the error rate in *Lucent*. While I believe this section of *Lucent* is arguably dictum, and disagree that any court should be performing this type of back-of-the-envelope math to reopen a jury's verdict, the fact that Lutron's estimated recreation of our jury's math is significantly further off from our verdict than was the case in *Lucent* sufficiently distinguishes that case. Lutron has not demonstrated that an award of $2,672,000 "strongly suggests" that our jury used the EMVR, and therefore its argument that GeigTech failed to provide sufficient evidence to justify the application of the EMVR is immaterial to the lawfulness of our jury's verdict.

### ii.    Apportionment

In the alternative, Lutron claims that since GeigTech chose to pursue recovery under EMVR and offered no evidence as to the portion of Palladiom Wired profits attributable to the patented feature, there was no "range" of permissible apportionment-based awards in evidence – only Dr. Meyer's proposed $398,706 figure. Dkt. No. 596, at 10. Under that theory, Lutron claims that GeigTech waived any apportionment-based theory of damages, meaning that even if the jury did apportion as opposed to using the EMVR, any verdict that did not mirror Dr. Meyer's $398,706 figure would necessarily be unlawful. Dkt. Nos. 591, at 19; 596, at 8.

Although Lutron has previously suggested that it believed GeigTech based its theory of damages solely on the EMVR, this is the first time that Lutron has claimed that GeigTech explicitly waived any alternative apportionment-based remedy. At the close of GeigTech's case, Lutron moved under Rule 50 for JMOL "that the entire market value is inapplicable, *and because their damages theory is based on the entire market value rule*, they have not carried that burden to prove

any measure of damages." Tr. 289 (emphasis added). I initially denied the motion, *id*., but at the close of all evidence, I reversed my earlier denial and decided to reserve on the motion instead, Tr. 466. Subsequently, Lutron did not object to the portion of my jury charge where I instructed that if the jury did not find evidence in support of the EMVR, it "must apportion, so that the royalty only covers the value of the patented bracket and does not compensate GeigTech for any other features of the shading system." Tr. 540. Nor did Lutron ask that I charge the jury that they must either find sufficient evidence in support of EMVR or deliver a verdict of exactly $398,706. GeigTech thus did not waive the ability to recover via apportionment if the jury chose not to pursue EMVR.

As stated above, despite attempts to "work the math backwards," we do not know exactly how the jury came to the damages figure in their verdict. What we do know is that the Federal Circuit requires that a "jury's decision with respect to an award of damages must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Lucent*, 580 F.3d at 1310. Here, the jury did not deliver a verdict that was "either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1554 (Fed. Cir. 1995). And since "the jury is not bound to accept a rate proffered by one party's expert," it made the well-reasoned choice of "an intermediate royalty rate" between the parties' two preferred figures. *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005).

The jury was asked to come up with a reasonable royalty based on "a hypothetical negotiation between the patentee and the infringer when the infringement began" – an analysis that "necessarily involves an element of approximation and uncertainty." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). Specifically, the jury was instructed to base its verdict

on the 15 *Georgia-Pacific* factors and "other factor that, in [the jury's] mind, would have increased or decreased the royalty that both parties would have agreed to." Tr. 535-38. Both parties' experts offered testimony on many of the *Georgia-Pacific* factors, there was sufficient evidence to support a jury finding anywhere between the parties' two figures, and therefore, "the jury's choice was within the range encompassed by the record as a whole." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010).

Lutron's Motion for Judgment as a Matter of Law on damages is, therefore, DENIED.

## II.    GeigTech's Motion for Enhanced Damages, Interests, and Costs

Following the first of our two trials, GeigTech moved for enhanced damages, attorneys' fees, interest, costs, and accounting. Dkt. No. 500. I denied the motion as to attorneys' fees, GeigTech, 2024 WL 3595413, at *24, but since I was also ordering that the original damages verdict be remitted or that a new trial be held on damages, I concluded that "there is no basis for granting an award of enhanced damages due to willfulness," because "I have no idea what the damages are, so I cannot possibly reach a conclusion on whether or not to enhance them." *Id.* at *21. I therefore denied GeigTech's motion without prejudice to renewal. *Id*. GeigTech now renews its motion for enhanced damages and is seeking the maximum enhancement permitted by law – three times the jury's damages verdict – which would set damages at $8,016,000. Since the jury has delivered a damages verdict that is reasonable and supported by the evidence, I now consider GeigTech's renewed motion for enhanced damages, interests, and costs.

### a.   Legal Standard

Following a jury verdict determining the reasonable royalty owed to a patent holder who has demonstrated infringement, the Patent Act permits the trial court to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Courts may mete out these

"vindictive or punitive" damages when "the circumstances of the case appear to require it" – not "in a typical infringement case, but . . . instead . . . as a sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 98, 103 (2016).

Prior to *Halo*, the Federal Circuit in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992) provided a non-exhaustive list of factors that courts could use in determining whether to afford enhanced damages. Those factors include:

(1) whether the infringer deliberately copied the ideas or design of another;

(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;

(3) the infringer's behavior as a party to the litigation;

(4) the defendant's size and financial condition;

(5) the closeness of the case;

(6) the duration of the defendant's misconduct;

(7) any remedial action by the defendant;

(8) the defendant's motivation for harm; and

(9) whether the defendant attempted to conceal its misconduct.

*See id*. at 827. For the maximum treble damages enhancement to be imposed, "the court's assessment of the level of culpability must be high." *Id.* at 828.

### b.    GeigTech Is Entitled to Enhanced Damages

Predictably, both parties assert that each of the nine *Read* factors points in their favor. The truth lies in the middle. Factors 1, 4, 6, 7, and 8 weigh in favor of enhancing the jury's damages award, factor 3 is neutral on the issue, and factors 2, 5, and 9 weigh against enhancement. The

distribution of these factors for and against enhancement suggests that I should enhance the damages award, but not by the maximum multiple. The evidence in this case supports a two times enhancement of the jury's damages award, or a total award of $5,344,000. My analysis of the *Read* factors proceeds as follows:

Factor 1 (Deliberate Copying):   There is no doubt that Lutron deliberately copied J. Geiger's '717 Patent. In the first trial in this case, the jury found that Lutron's Palladiom Shading System willfully infringed all of GeigTech's Asserted Claims. *See GeigTech*, 2024 WL 3595413, at *1. During that trial, Glenn Laverty, a Lutron engineer, and Vladislav Pejic, a Lutron Project Design Leader, admitted to lying in order to gain access to GeigTech's showroom in New York to investigate GeigTech's shade brackets. Tr. 720:17-724:4; 1351:8-1352:7. Laverty and Pejic also admitted to having third party homeowners lie on Lutron's behalf in order to have GeigTech products installed in their homes for Lutron to review. Tr. 690:3-692:19; 729:6-749:15; PX 81; PX 90; PX 97; PX 117. Mr. Pejic and Mr. Laverty's conduct was part of Project "Snowy Owl", Lutron's internal project designed to copy GeigTech's brackets in order to create what would eventually become the Palladiom Bracket. Evan Graham, Lutron's manager of engineering, admitted to "reverse engineering and modeling . . . from the Geiger patents and literature." PX 97. Dave Kirby, the lead mechanical engineer on Snowy Owl, described the project as "look[ing] into designing a system similar to J. Geiger's brackets for our shades." PX 316 at 3. Another engineer on the Snowy Owl team, Max Hakkarainen, stated in his engineering notebook that the purpose of the project was to create "Geiger-esque" shades. PX 79 at 2.

Although Lutron argues that enhancement based on Factor 1 is improper because any deliberate copying took place before GeigTech had any "protectable intellectual property right in what Lutron supposedly copied," (Dkt. No. 592, at 8), numerous courts in this district and others

have held that such conduct nonetheless weighs in favor of enhancement. *See Trs. of Columbia Univ. City of New York v. Gen Digital Inc.*, 2023 WL 8699435, at *10–11 (E.D. Va. Sept. 30, 2023); *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 2023 WL 1475116, at *13 (N.D. Ill. Feb. 2, 2023), *appeal dismissed*, 2023 WL 8429823 (Fed. Cir. Dec. 5, 2023). However, at least one district court has held that if the deliberate copying preceded a protectable intellectual property right, that fact should diminish, at least in part, the weight of *Read* Factor 1. *See Nox Med. Ehf v. Natus Neurology Inc.*, 2018 WL 4062626, at *4 (D. Del. Aug. 27, 2018), *on reconsideration*, 2018 WL 6427686 (D. Del. Dec. 7, 2018).

This factor weighs in favor of enhancement.

Factor 2 (Patent Investigation and Good-Faith Belief in Invalidity):  I previously addressed the question of whether Lutron held a good faith belief in its defenses in my ruling denying GeigTech motion for attorney's fees. There, I explained that, "At no point during nearly eight years of litigation has this court ever found Lutron to be pursuing its defenses in bad faith or found that those defenses were unreasonable." *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2024 WL 3595413, at *23 (S.D.N.Y. July 30, 2024). I declined to make a finding of bad faith there and decline to do so now. GeigTech's arguments on the issue merely blur this *Read* factors into others in search of an overarching condemnation of Lutron for willful infringement – a strategy that directly contradicts the Federal Circuit's instruction that district courts "consider *all relevant factors* in determining whether to award enhanced damages." *Polara Eng'g, Inc. v. Campbell Co.*, 894 F.3d 1339, 1355 (Fed. Cir. 2018) (emphasis added). The fact that both the jury and I clearly did not agree with many of Lutron's arguments raised in its defense does not mean that those arguments were made in want of a good-faith belief in the invalidity of GeigTech's patent.

This factor weighs against enhancement.

Factor 3 (Litigation Behavior): I have also had the occasion to address the parties' litigation behavior throughout the past few years. While GeigTech is correct that Lutron's deponent's lying during a deposition is a serious offense, and is not taken lightly by this Court, *see GeigTech*, 2024 WL 3595413, at *12, so too is the type of gamesmanship that GeigTech engaged in in the leadup to our damages trial, *see Geigtech E. Bay LLC v. Lutron Elecs. Co.*, 2024 WL 4751281, at *10 (S.D.N.Y. Nov. 12, 2024). In light of all of the facts underlying the parties' litigation conduct during this case, I find that this factor is neutral on the issue of enhancement.

Factor 4 (Size and Financial Condition): Lutron's size and financial condition also weigh in favor of awarding enhanced damages. As "a large company with extensive financial means," *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1371 (Fed. Cir. 2004), Lutron's non-infringing business would not be "unduly prejudice[d]" by an order to pay enhanced damages resulting from its misconduct. *Read*, 970 F.2d at 827.

Lutron argues that *Read* Factor 4 can only be neutral on or weigh against the enhancement of damages because, "The fact that an infringer could afford to pay an additional million dollars or so in damages does not provide a reason to do so." Dkt. No. 592, at 18 (internal citations omitted). But Lutron is incorrect – courts have repeatedly found that this factor can weigh in favor of enhanced damages where the defendants' size and financial condition suggest that "in context [the verdict] may not be enough, without enhancement, to deter infringing conduct," *Stryker Corp. v. Zimmer, Inc.*, 2017 WL 4286412, at *5 (W.D. Mich. July 12, 2017), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018) or where the party's "size could have been leveraged to implement a non-infringing alternative," *Apple Inc. v. Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1033 (N.D. Cal. 2017).

Here, GeigTech cites data suggesting that Lutron generates estimated annual revenue in excess of $500,000,000 and trial testimony reflecting profits of at least $25,873,830 on the accused products alone – figures that Lutron does not dispute. Dkt. No. 588, at 17-18. In light of these figures, enhanced damages that, at most, could add $5,344,000 to the total verdict would not be inappropriate for a company of Lutron's size and condition.

This factor weighs in favor of enhanced damages.

Factor 5 (The Closeness of the Case): This case was plainly close. As I recounted in my order resolving motions filed after the first trial, Lutron "vigorously pursued" its case throughout the course of litigation and its defenses were "meritorious and not exceptional." *GeigTech*, 2024 WL 3595413, at *22. As I listed in that order, "Lutron's patent defense arguments resulted in, among other things, (i) GeigTech's withdrawal of two patents-in-suit and numerous claims of the '717 Patent; (ii) GeigTech's failure to secure a preliminary injunction because Lutron raised substantial questions on the merits; (iii) Lutron's successful invalidation of several claims of the '717 Patent through PGR; and (iv) the Court's denial of GeigTech's motion for summary judgment of noninfringement." *Id*. Given these indicators of a close case, along with a final damages verdict granting GeigTech less than the full value of damages it asked for, I find that this factor weighs against enhancement.

Factors 6 & 7 (Duration of Misconduct and Remedial Action): GeigTech argues for enhancement on the grounds that Lutron's infringement began "when it reviewed the '821 patent" in 2016 and continues to this day. Dkt. No. 588, at 19-21. Lutron's opposition cites its good-faith defenses throughout the litigation and the fact that it remediated soon after the jury verdict. Dkt. No. 592, at 21. On these often-linked factors, courts have found that the fact a patent was "issued only a short time before the filing of the lawsuit," *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x

959, 973 (Fed. Cir. 2018), should weigh against enhancement. This was the case here, as GeigTech did not even apply for the '717 patent until May 31, 2018 – two weeks before this case was filed. However courts have also held that, continuing to sell the infringing products after notice of infringement and during the course of litigation supports enhancement. *See, e.g.*, *Genes Indus., Inc. v. Custom Blinds & Components, Inc.*, 2018 WL 11354574, at *6 (C.D. Cal. Jan. 29, 2018); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 2016 WL 6537977, at *8 (N.D.N.Y. Nov. 3, 2016); *Sabinsa Corp. v. Olive Lifesciences Pvt. Ltd.*, 2018 WL 11355086, at *7 (D.N.J. May 30, 2018). The *Read* case itself, in discussing Factor 7, cites *Intra Corp. v. Hamar Laser Instruments, Inc.*, 662 F. Supp. 1420, 1439 (E.D. Mich. 1987), *aff'd without opinion*, 862 F.2d 320 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1021 (1989), where damages were "only doubled" because defendant "voluntarily ceased manufacture and sale of infringing systems *during the pendency of this litigation*." *Read*, 970 F.2d at 827 (emphasis added). Ceasing manufacture and sale during the pendency of litigation is far more remedial an action than Lutron engaged in here when it "stopped selling and shipping the accused brackets" one week *after* the jury delivered a verdict. Dkt. No. 592, at 21.

On these facts, I find that Factors 6 & 7, considered together, weigh slightly in favor of enhancement.

Factor 8 (Motivation for Harm): "When the infringer is a direct competitor, this factor generally weighs in favor of enhanced damages." *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 119 (D. Conn. 2022), *aff'd*, 2023 WL 7548208 (Fed. Cir. Nov. 14, 2023). GeigTech and Lutron were undoubtedly direct competitors, and the evidence discussed at length above showed that, in infringing the at-issue patent, Lutron was motivated to create a bracket that would recover market share that it was losing to GeigTech on account of its novel bracket design. Where

"the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor favors an award of enhanced damages." *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1116–17 (N.D. Cal. 2009), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010).

This factor favors enhancement.

Factor 9 (Concealment of Misconduct): The parties agree that Lutron did not attempt to conceal its infringement of the at-issue patent. *See* Dkt. Nos. 588, at 22; 592, at 23. However, GeigTech claims that Lutron's attempt to "'cover up' Snowy Owl" should equally support enhancement under this factor. Dkt. No. 588, at 22. There is no evidence in this case that Lutron attempted to conceal its infringement, and GeigTech cites no authority for the proposition that this court can transfer evidence of some other concealment into evidence relevant to enhanced damages.

This factor weighs against enhancement.

### c.  Interest and Costs

GeigTech seeks an award of (i) pre-judgment interest at the prime rate compounded quarterly, (ii) post-judgment interest at the statutory rate, and (iii) its costs.[1] Dkt. No. 588, at 24-25. Lutron argues that I should put off ruling on all three of GeigTech's requests because resolution by the Federal Circuit could eliminate the need for the Court to reach these requests regarding judgment. This Court declines Lutron's request to defer determination of the interest and costs owed until after GeigTech's pending appeal.

On pre-judgment interest, GeigTech contends that it should be awarded pre-judgment interest at the prime rate compounded quarterly, while Lutron responds that GeigTech should be awarded interest at the U.S. Treasury Bill rate compounded annually. GeigTech cites in support of

---

[1] GeigTech asks that it be permitted to supplement its request for costs via a bill of costs following the Court's order.

its proposition Scott Linthicum's trial testimony concerning a 2014 revolving credit agreement between J. Geiger and Sherman Financial, under which GeigTech was loaned funds at a rate of LIBOR plus 6%. Dkt. No. 588, at 25. Lutron disputes the relevance of this agreement because it represents Sherman Capital's ownership investment in GeigTech, not an arms' length financing deal. Dkt. No. 592, at 25. The Court "has wide latitude in selection of interest." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). I agree with Lutron that GeigTech's financing agreement, entered into years before any infringement began, does not suggest "a causal connection between any borrowing and the loss of the use of the money awarded as a result of [the] infringement." *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955. Therefore, I will impose an award of prejudgment interest at the 52-week Treasury Bill rate, compounded annually. *See Accuscan, Inc. v. Xerox Corp.*, 2000 WL 280005, at *2 (S.D.N.Y. Mar. 15, 2000) (collecting cases). Such prejudgment interest shall only be applied to the compensatory portion of the damage award, *i.e.*, $2,672,000.

The parties agree that GeigTech is also statutorily entitled to post-judgment interest, and I specify that such interest, calculated pursuant to 28 U.S.C. § 1961, applies to the entire judgment amount, enhanced damages, prejudgment interests, as well as any costs that I award.

Finally as to costs, while Lutron does not dispute that GeigTech is statutorily entitled to costs, I cannot award costs blindly without seeing a bill of costs. GeigTech is ordered to submit its bill of costs within 10 days of this order. GeigTech should also submit a form of final judgment to the Court to enter.

## CONCLUSION

For the foregoing reasons:

1. Lutron's motion for JMOL is DENIED;

2.  GeigTech's motion for enhanced damages is GRANTED, with the damages verdict enhanced by a factor of two, for a total award of $5,344,000;

3.  GeigTech's motion for pre-judgment interest is GRANTED, with interest set at the 52-week Treasury Bill rate, compounded annually;

4.  GeigTech's motion for post-judgment interest is GRANTED, pursuant to the terms in 28 U.S.C. § 1961(a), (b);

5.  The Court RESERVES on GeigTech's motion for costs until GeigTech has provided a bill of costs, which it is ordered to do within the next 10 days.

Dated: June 4, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL